IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KENNETH MALIK MILLER and TINA MILLER, | |
| Plaintiffs, | CIVIL ACTION NO. 12-1720 |
| v. | |
| MICHAEL M. WENEROWICZ, | |
| Defendant. | |

## OPINION

**Slomsky, J.**                                                        **September 22, 2015**

## I.      INTRODUCTION

This case involves alleged Fourteenth Amendment violations due to the delay by a prison official in approving an inmate's request to marry.  Kenneth Malik Miller ("Mr. Miller") is currently serving a life sentence at the State Correctional Institution at Graterford.  According to Plaintiffs Kenneth and Tina Miller, Michael M. Wenerowicz ("Defendant") denied them of their right to marry for "a period of over one year" in order to "deprive Plaintiffs of their rights." (Doc. No. 24.)  The Millers eventually married on April 17, 2012, after approval was granted. Defendant denies that he has violated the rights of Plaintiffs and has filed a Motion for Summary Judgment.  (Doc. No. 53.)  The Motion is now before the Court for disposition.

## II.      BACKGROUND

Plaintiff Kenneth Miller has been serving a life sentence in the Pennsylvania Department of Corrections ("DOC") since 1987.  (Doc. No. 53-4 at 7.)  In April 2011, Mr. Miller was transferred to the State Correctional Institution ("SCI") at Graterford from the SCI at Huntingdon.  (Doc. No. 53-4 at 7.)  Defendant Michael M. Wenerowicz has been the

superintendent of SCI Graterford since May 2010.  (Doc. No. 53-8 at 32.)  Procedures are in place at SCI Graterford by which inmates are permitted to marry.  (Doc. No. 53-9.)  If an inmate at SCI Graterford wishes to get married, he must submit a request to his counselor.  (Id. at 2.) The counselor then will interview the inmate's fiancée and submit the request to the superintendent for approval or denial.  (Id.)  "Even where a marriage is approved, the process from the initial request to the actual marriage ceremony can take three to six months at SCI Graterford."  (Doc. No. 53-2 at 2.)

Plaintiff Kenneth Miller's first in-person meeting with Tina Turner Miller ("Mrs. Miller") was during her visit in August 2010 at SCI Huntington.  (Doc. No. 53-4 at 8.)  At that time Mr. and Mrs. Miller were married through an Islamic ceremony.[1]  (Id.)  In addition, they wished to follow this ceremony with one they believed would be sanctioned by the SCI and civil law.  (Id. at 20:15-20.).  In April 2011, Kenneth Miller informed his counselor of his desire to marry Tina Miller, and the counselor submitted the request to Defendant pursuant to the DOC Marriage Policy (the "Marriage Policy").[2]  (Doc. No. 53-5 at 3.)  According to Defendant, he rejected the

---

[1]  Mr. Miller explained the Islamic marriage process as follows:

> Islamically, when a person makes their intentions and vows they do so in front of Muslims, male and female.  And they make their intentions to get married, you know.  And they do so in the name of God. . . . So as Muslims, because the DOC refuses to take us to the courthouse or come to the prison, [a] lot of times when a man and woman decides to get married, the only thing they could do is make their vows in front of believers and pretty much mimic what they would do if they was getting married publically or officially by any believing officials.  So it's just a matter of vows.

(Doc. No. 53-4 at 9-10.)

[2]  Prior to January 20, 2012, the Marriage Policy did not provide reasons for which a supervisor may deny a marriage request.  (Doc. No. 53-9 at 1-5.)  On January 20, 2012, the Marriage Policy was amended to include the following, in relevant part: "The Facility Manager will deny a marriage if: . . . (2) the inmate has not completed any mandatory sexual treatment

request because of a recent misconduct violation incurred by Mr. Miller.  (Doc. No. 53-8 at 14:25-15:11.)

     Mr. Miller's counselor told him that his request had been denied because Defendant did not know him, and that he could renew his request in six months.  (Doc. No. 53-4 at 53:4-54:10.)  Mr. Miller did so in October 2011, and Defendant again rejected the request.  (Id. at 63:9-12.)  According to Defendant, he was concerned about Mr. Miller's behavior at the prison, including a "Z-Code rationale"[3] and a past misconduct violation wherein Mr. Miller allegedly exposed himself to a female Corrections Officer.[4]  (Doc. No. 53-8 at 7:6-15, 16:14-19.)

     In November 2011, both Plaintiffs wrote separate letters to Defendant restating their desire to get married.  (Doc. Nos. 53-5, 53-7.)  In his response to Mrs. Miller, Defendant explained that he was withholding approval because Mr. Miller's "Z-Code rationale concerns me at this time" and he could not "approve this request without reviewing all factors."  (Doc. No. 53-5.)  Defendant further stated that he would reconsider the request in six months "as long as Mr. Miller continues to show positive adjustment."  (Id.)  According to Defendant—though not shared in his letter to Mrs. Miller—he also was concerned about prior sexual misconduct violations and the "possible need for sex treatment program."  (Doc. No. 53-2 at 5.)

---

program (as applicable); . . . (5) there are other significant situations, similar to those listed above, which would warrant the denial of a marriage for a period of time."  (Doc. No. 53-9 at 7.)

[3] Inmates with Z-Codes are assigned to a single cell.  Defendant testified at his deposition, "[t]o be Z-Coded, for example, you have to have a mental health diagnosis or have very assaultive behavior.  You could be a sexual predator.  Those are some of the criteria that we look at for single cell status for the Z-Code."  (Doc. No. 53-8 at 7.)

[4] Mr. Miller disputes the relevance of these violations.  According to Mr. Miller, "Plaintiff Husband got two misconducts for allegedly exposing himself.  He pleaded not guilty but was found guilty.  At the time of his application to marry, that conduct was not relevant to the granting of permission."  (Doc. No. 54 ¶¶ 31-33.)

Upon consultation with other prison officials, Defendant ultimately determined that "the Z-Code rationale was not a concern" and that sex offender treatment was unnecessary. (Doc. No. 53-8 at 16:19-25.) Defendant also had observed improvement in Mr. Miller's conduct record since his arrival at SCI Graterford. (Id. at 17:20-18:21.) Accordingly, Defendant wrote to Mr. Miller on January 31, 2012, and suggested that he reapply for approval. (Doc. No. 53-9.) Mr. Miller did so through his counselor, who sent a formal request to Defendant on March 8, 2012. (Doc. No. 53-4 at 89:8-90:3.) On March 20, 2012, Defendant approved the marriage (Doc. No. 53-9 at 18) and on April 27, 2012, Mr. and Mrs. Miller were married. (Doc. No. 53-6 at 56:8-12.)

On April 4, 2012, after the marriage had been approved but before the wedding, Mr. Miller initiated this action pro se. (Doc. No. 1.) The case was originally assigned to the Honorable Michael Baylson, a Judge of this Court. Mr. Miller was later appointed counsel, and on September 24, 2013, he filed an Amended Complaint adding Tina Turner-Miller as a co-plaintiff. (Doc. No. 24.) The Amended Complaint contains three counts, alleging: (1) Denial of Rights, (2) Retaliation, and (3) Tortious Interference with Contract. (Id.) On October 31, 2013, Defendant filed a Motion to Dismiss (Doc. No. 28) and on December 19, 2013, Plaintiffs filed a Response to the Motion (Doc. No. 30). A hearing on the Motion was held in front of Judge Baylson on January 27, 2014. On February 2, 2014, Judge Baylson entered an Order granting the Motion to Dismiss on Counts II and III, and denying the Motion to Dismiss on Count I. (Doc. No. 37.)

Following a telephone conference with counsel for the parties, Judge Baylson entered an Order on June 12, 2014, recusing himself from the case due to his possible role as a fact

witness.[5]  (Doc. No. 44.)  The case was then reassigned to this Court.  (Doc. No. 45.)  Defendant

filed the Motion for Summary Judgment on the remaining Count on November 24, 2014 (Doc.

No. 53), and Plaintiffs filed a Response on December 10, 2014 (Doc. No. 54).  For reasons that

follow, the Court will grant Defendant's Motion for Summary Judgment.

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this

decision, the court must determine whether "the pleadings, depositions, answers to

interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that

the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155,

158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir.

2010) (internal quotation marks omitted)).  A disputed issue is "genuine" only if there is a

sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.

Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the

---

[5]    Judge Baylson became a fact witness after Plaintiffs asked him to marry them during an
unrelated lawsuit.  According to Plaintiffs,

> [Judge Baylson] was ready and willing to marry Plaintiffs on March 17, 2011,
> when they appeared before him for an unconnected law suit.  The only reason he
> didn't perform the wedding then and there was that Mrs. Turner had just obtained
> the wedding license, and there is a three-day waiting period for licenses to marry
> in Pennsylvania.  There then followed a phone call between Major Dohman, one
> of the parties to the unrelated law suit, and Defendant Wenerowicz.  The parties
> differ on what was said during and after that phone call, but Kenneth Miller was
> returned to Graterford with the understanding on his part that he would simply
> have to apply for permission to marry and it would be granted.

(Doc. No. 54-1 at 1-2.)  Because Judge Baylson ultimately was unable to perform the
wedding, his role in the case is irrelevant to the instant Motion.

potential to alter the outcome of the case." <u>Favata</u>, 511 F. App'x at 158.  Once the proponent of

summary judgment "points to evidence demonstrating no issue of material fact exists, the non-

moving party has the duty to set forth specific facts showing that a genuine issue of material fact

exists and that a reasonable factfinder could rule in its favor." <u>Id.</u> (quoting <u>Azur</u>, 601 F.3d at 216

(internal quotation marks omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be

believed, and all justifiable inferences are to be drawn in his favor."  <u>Id.</u> (quoting <u>Chambers ex</u>

<u>rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.</u>, 587 F.3d 176, 181 (3d Cir. 2009)

(internal quotation marks omitted)).  The Court's task is not to resolve disputed issues of fact, but

to determine whether there exist any factual issues to be tried.  <u>Anderson</u>, 477 U.S. at 247-249.

Whenever a factual issue arises which cannot be resolved without a credibility determination, at

this stage the Court must credit the non-moving party's evidence over that presented by the

moving party.  <u>Id.</u> at 255.  If there is no factual issue, and if only one reasonable conclusion

could arise from the record regarding the potential outcome under the governing law, summary

judgment must be awarded in favor of the moving party.[6]  <u>Id.</u> at 250.

---

[6]  Plaintiffs cite the Pennsylvania Supreme Court decision of <u>Borough of Nanty-Glo v. Am. Sur.</u>
<u>Co. of New York</u>, 309 Pa. 236, 238 (1932), in arguing that Defendant has not offered
sufficient evidence to support summary judgment.  "<u>Nanty-Glo</u> precludes summary judgment
where the moving party relies solely upon testimonial affidavits and depositions of his
witnesses to resolve material issues of fact."  <u>Dudley v. USX Corp.</u>, 414 Pa. Super. 160, 169
(1992).  However, this doctrine has not been applied in this Circuit.  <u>See</u> <u>Seeley ex rel.</u>
<u>Shepard v. Derr</u>, No. 4:12-CV-917, 2013 WL 3776424, at *3 (M.D. Pa. July 17, 2013)
("Whatever effect the <u>Nanty–Glo</u> rule may have on state practice, reliance on this rule is
misplaced in the instant federal case, as courts in this circuit have consistently found that this
state-law procedural rule has no application to motions for summary judgment in federal
court.").  Because Rule 56 contemplates the use of testimonial evidence to support a summary
judgment motion, the Court will not apply the <u>Nanty-Glo</u> doctrine.

## IV.    ANALYSIS

Defendant Wenerowicz is the superintendent of SCI Graterford and the only defendant in this case.  He is being sued in his individual capacity.  Plaintiffs allege that Defendant infringed upon their Fourteenth Amendment right to marry in violation of 42 U.S.C. § 1983.  To establish a claim under Section 1983, a plaintiff must (1) establish a violation of a constitutional right, and (2) show that the alleged violation was committed by a person acting under color of state law. Boyer v. Mohring, 994 F. Supp. 2d 649, 657 (E.D. Pa. 2014) (citing West v. Atkins, 487 U.S. 42, 48 (1988)).  Defendant, as a prison official, was at all relevant times acting under color of state law.

The only remaining Count in Plaintiffs' Amended Complaint alleges that "Defendant Wenerowicz unreasonably denied Plaintiffs of their right to marry under the Fourteenth Amendment to the United States Constitution for a period of over one year.  His denial was willfully made in order to deprive Plaintiffs of their rights, and has caused Plaintiffs pain and suffering."  (Doc. No. 24 at 3.)

In his Motion for Summary Judgment, Defendant contends that Plaintiffs' Section 1983 claim against him cannot succeed because, as a government official, he is entitled to qualified immunity.  (Doc. No. 53 at 9.)  In a recent decision, the Supreme Court explained:

> The doctrine of qualified immunity protects government officials from liability for civil damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."

Wood v. Moss, 134 S. Ct. 2056, 2066-67 (2014) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)).  "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability."  Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) cert. denied, 133 S. Ct. 41 (2012).  Qualified immunity "protects all but

the plainly incompetent or those who knowingly violate the law." Taylor v. Barkes, 135 S. Ct.

2042, 2044, 192 L. Ed. 2d 78 (2015) (quoting Ashcroft, 131 S. Ct. at 2085).

The Third Circuit has stated the following in regard to the two-part qualified immunity

test:

> A qualified immunity inquiry is two-pronged, though courts are free to address the two elements in whichever order they deem appropriate. Normally, however, in considering a qualified immunity issue, we will ask whether a defendant's conduct violated a [plaintiff's] statutory or constitutional rights before addressing whether that law had been established at the time of the violation so that the unlawfulness of the conduct should have been apparent to an objectively reasonable official.

Halsey v. Pfeiffer, No. 13-1549, 2014 WL 1622769, *9 (3d Cir. Apr. 24, 2014).

In accordance with the two-part test set forth above, the Court will first examine whether

a constitutional violation as alleged by Plaintiffs actually exists.  The Court should avoid

defining the contours of a constitutional right "at a high level of generality."  Spady v.

Bethlehem Area Sch. Dist., No. 14-3535, 2015 WL 5103553, at *4 (3d Cir. Sept. 1, 2015)

(quoting Ashcroft, 131 S. Ct. at 2084).  Broadly delineating the constitutional right "would . . .

convert the rule of qualified immunity that our cases plainly establish into a rule of virtually

unqualified liability simply by alleging violation of extremely abstract rights."  Spady, No. 14-

3535, 2015 WL at *4 (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).

"The freedom to marry has long been recognized as one of the vital personal rights

essential to the orderly pursuit of happiness by free men."  Toms v. Taft, 338 F.3d 519, 526 (6th

Cir. 2003) (quoting Loving v. Virginia, 388 U.S. 1, 12 (1967)).  While inmates have a right to

marry, the Supreme Court has held that this right may be restricted where the restriction is

reasonably related to a legitimate penological interest.  Turner v. Safley, 482 U.S. 78, 79 (1987).

In Turner, the Court struck down a Missouri regulation prohibiting prisoners from marrying

unless the superintendent found compelling reasons to permit marriage. 482 U.S. at 80. The Court stated: "Although prison officials *may regulate the time and circumstances under which a marriage takes place, and may require prior approval by the warden*, the almost complete ban on marriages here is not, on the record, reasonably related to legitimate penological objectives." Id. at 79 (emphasis added).

Because the Court must define the right in a particularized sense, "in light of the case's specific context," the Court considers the specific right in this case under the Due Process Clause to be the right of an inmate to approval of his marriage request without unreasonable delay. Spady, No. 14-3535, 2015 WL at *4 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). It is important to note here that Plaintiffs' request to marry was delayed rather than denied.

The next inquiry for purposes of qualified immunity is whether the specific constitutional right was so well-established that it would have been apparent to a reasonable superintendent that delaying the approval of an inmate's marriage request violated the constitutional rights of the inmate and his fiancée. A defendant will not be found to have violated a clearly established right unless "'existing precedent . . . placed the statutory or constitutional question' confronted by the official 'beyond debate.'" Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (quoting Ashcroft, 131 S. Ct. at 2083). Defendant contends that "it cannot be said that a reasonable official in Superintendent Wenerowicz's circumstances would be aware that withholding his approval of the marriage for ten months was a constitutional violation," but rather that "his actions were well within the bounds of the Constitution."[7] (Doc. No. 53 at 10.)

---

[7] Defendant withheld approval from April 2011 until he approved the marriage on March 20, 2012. (Doc Nos. 53-5 at 3; 53-9 at 18.) Therefore, Defendant withheld approval for more than ten months but less than one year.

Once a defendant properly raises the defense of qualified immunity, the plaintiff bears the initial burden of overcoming that defense by showing that the defendant violated the plaintiff's clearly established right.  Spady, No. 14-3535, 2015 WL at *7 (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997)).  Plaintiffs have not offered any case law in support of their contention that Defendant violated a clearly established constitutional right that would have been apparent to a reasonable superintendent.  In fact, Plaintiffs do not argue in their Response to the Motion for Summary Judgment that Defendant violated a clearly established constitutional right.  Plaintiffs instead argue that Defendant's withholding approval for one year was arbitrary, and "arbitrary conduct does not pass the 'reasonableness test.'"  (Doc. No. 54-1 at 4.)  Plaintiffs further contend that because Defendant was aware of the Marriage Policy, and the Marriage Policy "virtually says" that Plaintiffs had a right to marry, Defendant's actions were arbitrary and unreasonable.[8]  (Id.)  But, as indicated above, in order to overcome the defense of qualified immunity, Plaintiffs must cite to cases or other law that recognize a clearly established right of a prisoner to have his marriage request promptly approved and that this right would have been apparent to a reasonable superintendent.

There is no case decided by the Supreme Court or by this Circuit specifically establishing the right of an inmate to get married without delay.  However, claims similar to Plaintiffs' have been litigated in other Circuits.  The reasoning in those cases is instructive.

In Spraggins v. Moore, the District Court for the Eastern District of Michigan adopted a Report and Recommendation granting a motion to dismiss a claim similar to the one presented here.  No. 07-12485, 2008 WL 795914, at *3 (E.D. Mich. Mar. 26, 2008).  The defendant prison

---

[8]  The Marriage Policy states, "[i]t is the policy of the Department to allow inmates to marry while incarcerated in accordance with the procedures set forth below."  (Doc. No. 53-9 at 2.)  These procedures include the requirement that the marriage request be submitted to prison officials for approval.  (Id.)

official in <u>Spraggins</u> had denied the plaintiff inmate's marriage request due to his "high security classification" but informed the plaintiff that if his jail classification was lowered, the prison official would revisit the request.  <u>Spraggins</u>, No. 07-12485, 2008 WL at *3.  The defendant did not revisit the request and had no further involvement in the matter.  <u>Id.</u>  The inmate and his fiancée, however, sued for violation of their constitutional right to marry.  <u>Id.</u>  In holding that the defendant was entitled to qualified immunity, the court reasoned: "Plaintiffs have a constitutional right to marry.  Nonetheless, a county jail is not designed to serve as a wedding chapel, and a reasonable time to consider and address security concerns raised by the request of a high risk prisoner is not an undue imposition."  <u>Id.</u>  The court then addressed the rights of the inmate's fiancée: "As to Plaintiff Hunt's right to marry an inmate, her rights are considered derivative of Plaintiff Spraggins. . . . Since Plaintiff Spraggins does not have [an] unqualified right to marry under the circumstances, Plaintiff Hunt's constitutional rights have not been violated."  <u>Id.</u> at *4.

Similarly, in <u>Toms v. Taft</u>, the Sixth Circuit Court of Appeals affirmed a grant of summary judgment on the grounds that qualified immunity shielded the defendant prison officials from allegations that they violated an inmate's right to marry.  338 F.3d 519, 526 (6th Cir. 2003).  Ohio law required prospective spouses to obtain marriage licenses in person, and the prison official defendants in <u>Toms</u> refused to assist the plaintiffs in obtaining the license.  338 F.3d at 521.  The plaintiff spouses sued, and the defendants asserted qualified immunity.  <u>Id.</u> The Sixth Circuit affirmed the lower court's determination that, although the prisoner had a constitutional right to marry, that right was not "so clearly defined that a reasonable person would have known that it was being violated by the defendants' actions."  <u>Id.</u> at 525-526. Ultimately, the Sixth Circuit held that "[t]he lack of prior authority imposing a duty upon

11

officials to act affirmatively to aid an inmate in exercising his right to marry indicates that qualified immunity is appropriate here."  Id. at 526.

The above cases indicate that the right of a prisoner to a prompt marriage is not clearly established.  Rather, a prisoner's right to marry may be restricted where reasonable.  Here, Defendant's denial pending investigation into Mr. Miller's misconduct violations was reasonable under the circumstances confronting Defendant.  In Spraggins, even where the defendant prison official did not ultimately grant the marriage request, the court found that his conditional denial "did not completely frustrate Plaintiff's constitutional rights" and that the defendant was therefore entitled to qualified immunity.  No. 07-12485, 2008 WL at *3.  Likewise, Defendant in this case did not completely frustrate Plaintiffs' constitutional rights because they did ultimately marry.  Furthermore, Defendant did not violate the Marriage Policy.  Even before the January 2012 amendments to the policy,[9] given the state of the law, Defendant would not have been aware that postponing approval of the request in view of his concerns would amount to a constitutional violation.  Defendant's investigation was reasonably related to a legitimate penological interest, namely concern about Mr. Miller's conduct in the prison.  Turner v. Safley, 482 U.S. 78, 79 (1987).

Moreover, at no point did Defendant deny Plaintiffs' request outright.  Instead, Defendant told Plaintiffs he would reconsider the request in six months.  Defendant ultimately allowed Plaintiffs to marry after consulting other officials regarding Mr. Miller's misconduct violations and observing an improvement in Mr. Miller's behavior.  Thus, as noted in Toms, there is a lack

---

[9]   As noted previously, the Marriage Policy was amended on January 20, 2012 to specify reasons that a supervisor may deny a marriage request.  (Doc. No. 53-9 at 7.)  These reasons include the failure of an inmate to complete a mandatory sexual treatment program, as well as "other significant situations, similar to those listed above, which would warrant the denial of a marriage for a period of time."  (Id.)

of case law in this Circuit or elsewhere indicating that Defendant had a duty to act to ensure Plaintiffs could quickly get married.  338 F.3d at 526.  Because Mrs. Miller's rights in this case are derivative of Mr. Miller's rights, she did not have an unqualified right to promptly marry Mr. Miller and was also subject to Defendant's reasonable investigation into Mr. Miller's request.

The right of an inmate to a prompt marriage is not so clearly established that Defendant, as superintendent of a prison, would reasonably believe that delaying approval of Plaintiffs' marriage request for the reasons noted above would violate the Constitution.  Thus, Plaintiffs' claims are barred by qualified immunity.  No genuine issues of material fact exist here and Defendant is therefore entitled to Summary Judgment.

## V.     CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment will be granted.  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KENNETH MALIK MILLER and TINA
MILLER,

               Plaintiffs,

     v.

MICHAEL M. WENEROWICZ,

               Defendant.

CIVIL ACTION
NO. 12-1720

## ORDER

**AND NOW**, this 22nd day of September 2015, upon consideration of Defendant's

Motion for Summary Judgment (Doc. No. 53), Plaintiffs' Response in Opposition (Doc. No. 54),

and Defendant's Reply (Doc. No. 55), and in accordance with the Opinion of the Court issued

this day, it is **ORDERED** that:

1.  Defendant Michael M. Wenerowicz's Motion for Summary Judgment on Count I

    (Doc. No. 53) is **GRANTED**.

2.  The action is **DISMISSED WITH PREJUDICE** pursuant to Local Rule 41.1(b).

3.  All pending motions are **DENIED AS MOOT**.

4.  The Clerk of Court shall close the above-captioned matter for statistical purposes.

                                BY THE COURT:

                                /s/ Joel H. Slomsky
                                JOEL H. SLOMSKY, J.